# UNITED STATES DISTRICT COURT

# DISTRICT OF MINNESOTA

| | |
|---|---|
| BRYAN NELSON, | Civil No. 12-1312 (JRT/JJG) |
| Plaintiff, | |
| v. | **MEMORANDUM OPINION AND ORDER ON CROSS MOTIONS FOR SUMMARY JUDGMENT** |
| SAXON MORTGAGE, INC. and FEDERAL NATIONAL MORTGAGE ASSOCIATION, | |
| Defendants. | |

Daniel M. Eaton, **CHRISTENSEN LAW OFFICE PLLC**, 800 Washington Avenue North, Suite 704, Minneapolis, MN 55401, for plaintiff.

Hilary J. Loynes and Michael J. Steinlage, **LARSON KING, LLP**, 30 East Seventh Street, Suite 2800, Saint Paul, MN 55101, for defendants.

Plaintiff Bryan Nelson brings this action against Defendants Saxon Mortgage, Inc. ("Saxon") and the Federal National Mortgage Association ("Fannie Mae") based on the foreclosure of Nelson's home by Saxon. Nelson's case rests upon the premise that the foreclosure of his home was invalid because Saxon failed to properly apply Nelson's payments to his loan and failed to timely and accurately inform him of the amount he was required to pay in order to reinstate his loan prior to the foreclosure sale. Nelson brings claims for violation of Minnesota's mortgage statutes, negligent misrepresentation, negligence, breach of the duty of good faith and fair dealing, and equitable estoppel

against Saxon and Fannie Mae (collectively, "Defendants" or "Saxon").   Additionally,

Nelson seeks to quiet title to his home and demands an accounting.

Saxon brings a motion for summary judgment with respect to all of Nelson's

claims.  Nelson seeks partial summary judgment as to his statutory claim, breach of the

duty of good faith and fair dealing, equitable estoppel, and quiet title claims.  Because

material issues of fact remain regarding whether Saxon's failure to provide timely

reinstatement information caused Nelson to be unable to exercise his statutory and

contractual right to reinstate, the Court will deny the motions for summary judgment with

respect to the statutory, breach of the duty of good faith and fair dealing, and quiet title

claims.  The Court will grant Saxon's motion for summary judgment on the remainder of

Nelson's claims because (1) Nelson has failed to present evidence creating a genuine

issue of material fact with respect to reliance as required to maintain a claim for negligent

misrepresentation and equitable estoppel, (2) Saxon did not owe Nelson a duty

independent of the contract and therefore cannot be held liable for negligence; and

(3) Nelson has not demonstrated that the information he seeks in his request for an

accounting was unavailable to him through ordinary discovery procedures.

## BACKGROUND

## I.    THE ORIGINAL MORTGAGE

On July 7, 2005, Nelson executed a note and mortgage (respectively, "the Note"

and "the Mortgage") secured by property located at 4620 Blaine Avenue in Inver Grove

Heights, Minnesota ("the Property") in the principal amount of $198,900.00.  (First Aff.

of Michael J. Steinlage, Ex. B at 48-50, Mar. 21, 2013, Docket No. 18.)[1]  The terms of

the Mortgage required Nelson to "pay when due the principal of, and interest on, the debt

evidenced by the Note and any prepayment charges and late charges due under the Note."

(*Id.*, Ex. B at 50.)  Additionally the Mortgage allowed the lender to charge Nelson "fees

for services performed in connection with Borrower's default . . . including, but not

limited to attorneys' fees, property inspection and valuation fees."  (*Id.*, Ex. B at 56.)  In

the event of Nelson's default on his obligations, the Mortgage permits the lender to

accelerate the loan and foreclose on the Property.  (*Id.*, Ex. B at 59.)

Saxon acquired servicing of the loan effective March 1, 2010.[2]  (Aff. of Annette

Anderson ¶ 4, Apr. 24, 2013, Docket No. 28; First Steinlage Aff., Ex. C at 70; First

Steinlage Aff., Ex. A (Dep. of Bryan Nelson ("Nelson Dep.") 24:17-22).)  After Saxon

began servicing the loan, Nelson failed to make payments for several months.

Consequently, the loan went into default and was referred for foreclosure.

## II.    AUGUST 2010 STIPULATION AGREEMENT

On August 26, 2010, Nelson and Saxon entered into a stipulation agreement ("the

Stipulation") to avoid foreclosure.  (First Steinlage Aff., Ex. D.)  In the Stipulation,

---

[1] Unless otherwise noted references to page numbers in citations to the parties' exhibits refer to the CMECF pagination.

[2] The parties dispute whether Nelson's loan was already in default in March 2010 when Saxon began servicing the loan.  The parties also dispute whether Saxon sent and Nelson received adequate information concerning the servicing transfer and acceptable methods for submitting loan payments.  Because Nelson's claims do not arise out of Saxon's conduct in March 2010, this dispute is irrelevant for purposes of the present summary judgment motions.

Nelson acknowledged the loan was in default in the amount of $14,384.78, including unpaid monthly installments, late penalties, and other charges, plus outstanding legal fees of $2,600.  (*Id.*, Ex. D at 3.)  Nelson also acknowledged that he was unable to pay those amounts.  (*Id.*)  The Stipulation provided a payment schedule, listing the amounts of the five payments contemplated under the Stipulation and their due dates.  (*Id.*, Ex. D at 4.)  Pursuant to the Stipulation, Saxon was to forebear from exercising its remedies under the Note and Mortgage, including acceleration and foreclosure.  (*Id.*)  Upon the "timely receipt" of all scheduled payments, Nelson's "scheduled monthly payment [would] resume pursuant to Mortgagor's Note and Security Instrument."  (*Id.*, Ex. D at 5.)  While the Stipulation was in place the Note and Mortgage were "valid and enforceable" and their terms remained "in full force and effect."  (*Id.*, Ex. D at 6.)

Nelson timely made the first two payments under the Stipulation via Western Union money transfer, paying $2,600 on September 1, 2010, and $1,273 on September 30, 2010.  (First Steinlage Aff., Ex. D at 4; *id.*, Ex. E at 8-10; First Aff. of Daniel M. Eaton, Ex. G at 71, 73, Apr. 16, 2013, Docket No. 26.)

## III.   LOAN MODIFICATION AGREEMENT

While the Stipulation was in effect, Saxon reviewed Nelson's account for a loan modification.  (Anderson Aff. ¶ 7.)  Saxon approved Nelson for a loan modification on October 11, 2010, and Nelson signed the agreement (the "Loan Modification") on October 18, 2010, and returned it to Saxon.  (*Id.* ¶ 9; First Steinlage Aff., Ex. F.)

### A.    Terms of the Loan Modification

By its terms, the Loan Modification became effective November 1, 2010.  (First Steinlage Aff., Ex. F at 12.)   Nelson's initial monthly payments under the Loan Modification were set at $1,014.24, beginning on December 1, 2010, which included principal, interest, and escrow amounts.  (First Steinlage Aff., Ex. F at 13; Anderson Aff. ¶ 10.)[3]  The Loan Modification capitalized past due amounts on Nelson's loan resulting in a new principal balance of $212,897.50.  (First Steinlage Aff., Ex. F at 13; Anderson Aff. ¶ 10; First Eaton Aff., Ex. I (Dep. of Annette Anderson ("Anderson Dep.") 47:17-49:1).)  No provision of the Loan Modification required Saxon to capitalize other fees, should they accrue, into the principal balance.  (First Steinlage Aff., Ex. F.)  Except as otherwise expressly provided, the Loan Modification retained the covenants, agreements, stipulations, and conditions of the original Mortgage.  (*Id.*, Ex. F at 14.)  Specifically, by signing the Loan Modification, Nelson agreed that "[a]ll the rights and remedies, stipulations, and conditions contained in the Security Instrument relating to default in the making of payments under the Security Instrument shall also apply to default in the making of the modified payments hereunder."  (*Id.*)

---

[3] The Loan Modification provided for monthly payments of principal and interest in the amount of $748.30 beginning on December 1, 2010.  (First Steinlage Aff., Ex. F at 13.) Although the Loan Modification did not expressly address the amount of Nelson's monthly escrow payments, the parties do not dispute, and the account activity on Nelson's loans reflects, that Nelson's initial monthly escrow payment under the Loan Modification was $265.94, resulting in an overall monthly payment of $1,014.24.  (First Eaton Aff., Ex. G at 71; *id.*, Ex. J.)

### B.    Application of Suspense Account Funds

The majority of Nelson's claims stem from his allegations that Saxon inappropriately implemented the changes dictated by the Loan Modification to his loan prior to the effective date of November 1. Nelson claims that this premature application of the changes caused Saxon to misapply certain funds to his account that ultimately resulted in Nelson owing more on his loan than he would have had the funds been applied properly.

Although the Loan Modification expressly stated that it was effective November 1, 2010, Saxon "booked" the Loan Modification on October 21, 2010. (Anderson Aff. ¶ 10.)   Booking is a process that adjusts Saxon's accounting system to reflect the modified terms of a loan. (*Id.*)  To book Nelson's loan, Saxon adjusted Nelson's account to show his loan as current (rather than past due), and changed the principal balance to reflect the new balance agreed to in the Loan Modification encompassing capitalized amounts that had previously been owing under the loan. (*Id.* ¶¶ 10-11; First Eaton Aff., Ex. G at 72-73.)

On October 21, 2010, when Saxon booked the Loan Modification, Nelson's account had certain "unapplied" or suspense account funds.[4] (Anderson Aff. ¶ 12.)  A suspense account is an account in which Saxon holds funds in the event that a borrower

---

[4] The record does not reflect which of Nelson's previous payments were being held in the suspense account on October 21, 2010. The record is similarly unclear with respect to the exact amount of funds being held in the suspense account at the time the Loan Modification was booked. For purposes of these motions, Nelson does not dispute that certain amounts were held in a suspense account. Nor does Nelson argue that the funds in the suspense account were held there improperly.

makes a payment to Saxon, but Saxon has a reason not to apply the payment to the loan at the time of payment.  For example, if a borrower makes a partial payment, Saxon will hold that money in a suspense account until there are sufficient funds in the account to make a full payment on the loan.  (Anderson Dep. 50:15-51:15.)  Use of a suspense account is authorized by the terms of Nelson's original Mortgage, which provided:

> Lender may accept any payment or partial payment insufficient to bring the Loan current, without waiver of any rights hereunder or prejudice to its rights to refuse such payment or partial payments in the future, but Lender is not obligated to apply such payments at the time such payments are accepted. . . . Lender may hold such unapplied funds until Borrower makes payment to bring the Loan current.  If Borrower does not do so within a reasonable period of time, Lender shall apply such funds or return them to Borrower.

(First Steinlage Aff., Ex. B at 51.)

The parties do not dispute that Saxon's application of suspense account funds to Nelson's loan was governed by the priority system in the original Note and Mortgage for payments generally.[5]  With respect to the priority of payment application, the Mortgage provided that:

---

[5] At oral argument, counsel for Saxon at first indicated that it was not entirely clear that the section of the Mortgage governing the priority of payments governed the application of suspense account funds.  Counsel later clarified that Saxon did believe the provision governing the priority of payments in the Mortgage could properly be construed as governing the application of suspense account funds, and that Saxon had attempted to follow that provision in applying Nelson's suspense account funds.  Because the Mortgage priority provision governed **all** payments accepted and applied by the Lender (First Steinlage Aff., Ex. B at 51 (emphasis added)) the Court agrees that the priority set out in the Mortgage applies to suspense account funds which are undisputedly borrower payments that are "accepted and applied" by the lender. (*See id.*)

all payments accepted and applied by Lender shall be applied in the following order of priority: (a) interest due under the Note; (b) principal due under the Note; (c) [escrow amounts]. Such payments shall be applied to each Periodic Payment in the order in which it became due. Any remaining amounts shall be applied first to late charges, second to any other amounts due under this Security Instrument, and then to reduce the principal balance of the Note.

(First Steinlage Aff., Ex. B at 51.)

On October 25, 2010, Saxon applied the funds from Nelson's suspense account to his loan. (Anderson Aff. ¶¶ 12-13.) Because the Loan Modification had already been booked, as of October 25, 2010, the parties contend that there were no fees or other amounts owing Nelson's loan on that day.[6] On October 25, 2010, Saxon applied $1,014.24 of the suspense account funds to Nelson's first monthly payment due December 1, 2010, under the Loan Modification. (Anderson Aff. ¶¶ 12-13; First Eaton Aff., Ex. G at 72.) Saxon then applied the remaining $2,085.76 from the suspense account to reduce the principal balance on Nelson's loan. (Anderson Aff. ¶ 13; First Eaton Aff., Ex. G at 72; *id.*, Ex. J.)

On October 27, 2010, and October 28, 2010, Saxon received and paid invoices from a third party for $2,278 in fees and costs related to Nelson's previous default and referral to foreclosure. (Anderson Aff. ¶ 14; First Steinlage Aff., Ex. H at 44; First Eaton

---

[6] The record reflects that $220 in miscellaneous fees may have been owing on October 21, 2010, after the Loan Modification was booked. (*See* First Eaton Aff., Ex. G at 72.) It appears from Nelson's November 1, 2010 account statement that $221.26 from the suspense account was used to pay these miscellaneous fees. (*See* First Eaton Aff., Ex. J.) The parties have not discussed this use of Nelson's suspense account funds in connection with the motions for summary judgment, and this application of Nelson's suspense account funds does not appear to be the basis of any of Nelson's claims.

Aff., Ex. G at 71-72.)   The fees and costs were then charged to Nelson's account, and were due and owing as of November 1, 2010.   (First Eaton Aff., Ex. G at 71-72; *id.*, Ex. J; First Steinlage Aff., Ex. H at 44.)

On November 1, 2010, Nelson made a payment to Saxon of $1,273 pursuant to the Stipulation.   (First Steinlage Aff., Ex. E at 10.)[7]   Saxon applied $1,014.24 of this payment to Nelson's January 2011 payment under the Loan Modification, leaving a credit of $258.76 in the suspense account.   (First Eaton Aff., Ex. G at 71; *id.*, Ex. J.)   Because Saxon applied the suspense funds to satisfy Nelson's December 2010 and January 2011 payments, the first monthly payment of $1,014.24 under the Loan Modification that Nelson would be required to pay to Saxon was not due until February 1, 2011.   (First Eaton Aff., Ex. J.)   Saxon added this amount to the $2,278 in foreclosure fees incurred in late October, and subtracted the remaining suspense account funds of $258.76, resulting in a $3,033.48 payment due February 1, 2011.   (*Id.*)

## C.   Default Under the Loan Modification

Saxon sent Nelson an account statement reflecting the status of his loan as of November 1, 2010 (the "November 2010 statement").   (First Eaton Aff., Ex. J.)   The November 2010 statement indicated that Nelson's next payment of $3,033.48 was due on or before February 1, 2011.   (*Id.*)   As noted above, the amount due included Nelson's regular monthly payment of $1,014.24 as well as fees and costs of $2,278 that Saxon had

---

[7] The record does not reflect why Nelson continued to make payments pursuant to the Stipulation after the Loan Modification was in place.   The parties do not dispute, however, that Nelson made the $1,273 payment on November 1, 2010.

incurred related to his prior default less $258.76 in remaining unapplied suspense account funds.  (*Id.*)  The November 2010 statement included a section describing the activity on Nelson's account which reflected the application of the suspense account funds detailed above.  (*Id.*)  Nelson did not make any payment on his loan in February 2011.  (First Steinlage Aff., Ex. I at 49.)[8]

Saxon sent Nelson a letter dated February 18, 2011, advising him that he had missed the February 1, 2011 payment.  (First Steinlage Aff., Ex. J.)  The letter noted that a late charge of $37.42 had been assessed to Nelson's account, bringing his total amount due to $3,060.40.  (*Id.*)  The letter indicated that Nelson could make a payment over the phone, through Saxon's website, or by Western Union money transfer.  (*Id.*)

---

[8] In their briefs the parties discuss at length the circumstances surrounding Nelson's failure to make the February 2011 payment.  Nelson alleges generally that Saxon provided him with inconsistent and confusing information regarding the due date and amount of his payment under the Loan Modification.  For example, Nelson testified that he contacted Saxon on November 12, 2010, and spoke with two representatives about the November 2010 statement.  (Nelson Dep. 73:3-75:5; First Eaton Aff., Ex. D at 36-37.)  When Nelson asked why his payment was due on February 1, 2011, instead of December 1, 2010, as specified in the Loan Modification, both representatives confirmed that Nelson's next payment was due on February 1, 2011, and allegedly told him that the change was due to the Loan Modification.  (Nelson Dep. 74:14-75:5, 79:7-18.)  Nelson also testified that the representatives indicated that the $2,278 listed as "Other/Fees" on the November 2010 statement and included in his total payment was actually a credit; the representatives allegedly told Nelson he should only pay $1,014.24 on February 1, 2011.  (Nelson Dep. 75:19-76:25.)  Saxon disputes these allegations by pointing to evidence of its phone logs.  Saxon maintains a system that automatically records calls that it receives on a loan.  (Anderson Aff. ¶ 19.)  The system electronically populates fields identifying the date and telephone number, and creates a notation when a borrower calls through the interactive voice response system for purposes of making a payment.  (*Id.*)  For example, Saxon argues that its phone logs indicate that Nelson was informed by Saxon representatives that suspense account funds were used to make his first two payments under the Loan Modification, resulting in his next payment being due on February 1, 2011.  (First Steinlage Aff., Ex. L at 40.)  The confusion surrounding the November 2010 statement does not appear to be the basis of any of Nelson's claims.  Accordingly, the Court finds this dispute is largely irrelevant for purposes of resolving the present motions.

Nelson claims that he attempted to make a payment by phone on or about March 1, 2011. (First Eaton Aff., Ex. D at 37.) He claims that the representative he spoke with told him that Saxon would not accept a payment of $1,014.24 because it was not the full amount due under the loan, which was $3,033.48. (*Id.*) Saxon cites to its phone records to support its contention that the March 1 phone call did not occur. (*See* First Steinlage Aff., Ex. L at 40.) Nelson ultimately failed to make the March 2011 payment.

By letter dated March 18, 2011, Saxon sent Nelson a notice of intent to accelerate his loan, because Nelson had "breached the covenant(s) contained in the Note and Security Instrument by failing to pay all sums due under the Note and Security Instrument." (First Steinlage Aff., Ex. K.) The notice indicated that this breach could be cured "by close of business on April 20, 2011 by sending a payment made payable to Saxon Mortgage Services, Inc. in the sum of $4,122.56 ("Delinquent Payment Amount")." (*Id.*)

## IV.   MAY 2011 REPAYMENT PLAN

On April 20, 2011 – the deadline for cure of Nelson's breach pursuant to the notice of acceleration – Nelson contacted Saxon to discuss his account. (First Steinlage Aff., Ex. L at 38-39.)[9] Pursuant to these discussions, on May 2, 2011, Nelson and Saxon

---

[9] Nelson also testified generally that throughout the spring of 2011 he attempted, but was unable, to obtain an itemization of the current payoff amount for his loan. (First Eaton Aff., Ex. D at 35-36.) The call logs for his account indicate that in April and May 2011 Nelson requested an itemization of amounts owed. (First Steinlage Aff. Ex. L at 37.)

entered into a formal repayment plan ("May Repayment Plan").   (First Steinlage Aff., Ex. M.)  In the May Repayment Plan, Nelson acknowledged "that the Note is in default as of this date and Mortgagor is unable to pay the defaulted amount of $5,186.22" to bring the loan current.  (*Id.*, Ex. M at 43.)  The May Repayment Plan set forth a schedule of payments and provided that "[a]ll payments described hereunder shall be made by cashier's check and/or bank wire."  (*Id.*, Ex. M at 44.)  The terms and conditions of the original Note and Mortgage remained in effect under the May Repayment Plan and Nelson acknowledged "that the forbearance provided herein shall be without prejudice to the Noteholder's right to exercise its power of sale or exercise any other rights and remedies under the Note and Security Instrument."  (*Id.*, Ex. M at 45.)

On May 2, 2011, Nelson made the $1,500 payment required by the May Repayment Plan using Western Union money transfer.  (Nelson Dep. 88:9-15; *see* First Steinlage Aff., Ex. M at 44.)  Nelson did not, however, make the $1,788.90 payment due on May 27, 2011.   (First Eaton Aff., Ex. D at 38; First Steinlage Aff. Ex. M at 44.) Nelson claims that when he called Saxon to make the May 27 payment over the phone, a representative told him that he was not allowed to make two payments on his loan in the same month.  (Nelson Dep. 89:2-90:24.)  Saxon contends that it has no policy or system limitation that prevents a borrower from making more than one payment in a month. (Anderson Aff. ¶ 20.)  Nelson did not attempt to make the May 27 payment through other means.  (Nelson Dep. 90:25-91:9.)

On May 31, 2011, Nelson withdrew $5,000 from a retirement account.  (Nelson Dep. 98:10-99:6.)  Nelson testified that if he had received "an accurate number" from

Saxon he would have applied these funds to his loan.  (*Id.* 98:22-23.)  Nelson testified that when he called Saxon around this time to inquire about the amount required to reinstate his loan, Saxon would provide him with an amount due but that the figure was different than the amount due under the May Repayment Plan.  (Nelson Dep. 141:25-142:23.)   Saxon's phone records reflect a call in early June in which a Saxon representative provided Nelson with a reinstatement figure and indicated that it was higher than the figure stated in the May Repayment Plan because the amount now included more missed payments.  (First Steinlage Aff., Ex. L at 30.)  Ultimately, Nelson never used the $5,000 withdrawal in connection with his loan.  (Nelson Dep. 91:10-13.)

## V.     JUNE 2011 REPAYMENT PLAN

On June 8, 2011, the parties entered into another repayment plan ("June Repayment Plan").  (First Steinlage Aff., Ex. N.)  In the June Repayment Plan, Nelson again acknowledged "that the Note is in default" and he was "unable to pay the defaulted amount of $5,836.70" plus "outstanding legal fees, valuation fees, [and] inspection fees in the amount of $1722.00" necessary to bring the loan current.  (*Id.*, Ex. N at 48.)  The terms of the original Note and Mortgage remained valid and enforceable, and Saxon retained its right to exercise its remedies under those agreements.  (*Id.*, Ex. N at 50.)

Nelson did not make the $1,987.02 payment on June 27, 2011, required by the June Repayment Plan.  (First Eaton Aff., Ex. D at 38-39; Nelson Dep. 91:10-13.)  Nelson testified that on June 27, 2011, he went to Western Union to make his payment but refused to make the payment when a teller informed him that Western Union would

charge a $288 fee.  (Nelson Dep. 61:21-62:5; First Eaton Aff., Ex. D at 38-39.)  Nelson

contacted Saxon and a representative informed Nelson he could make the payment by

certified check.   (Nelson Dep. 62:19-63:4.)   Nelson testified that he did not mail a

certified check because such a payment would not arrive in time to satisfy his June 27,

2011 payment obligation.  (Nelson Dep. 63:3-17.)

## VI.    AUGUST 2011 REPAYMENT PLAN

On August 18, 2011, the parties entered into another repayment plan ("August

Repayment Plan").  (First Steinlage Aff., Ex. O.)  In the August Repayment Plan, Nelson

once again acknowledged "that the Note is in default" and that he was "unable to pay the

defaulted amount of $8,020.11" plus "outstanding legal fees, valuation fees, [and]

inspection fees in the amount of $1600" in order to bring the loan current.  (*Id.*, Ex. O at

52.)  As with the other repayment plans, the terms of the original Note and Mortgage

remained valid and enforceable and the forbearance under the August Repayment Plan

was without prejudice to Saxon's remedies under those original agreements.  (*Id.*, Ex. O

at 54.)

Nelson made no payments under the August Repayment Plan.   (Nelson Dep.

91:10-13.)  Saxon served Nelson with a renewed notice of foreclosure on August 28,

2011, setting the foreclosure sale for September 30, 2011.  (First Steinlage Aff., Ex. P at

59, 62.)   The notice stated, "AS OF August 05, 2011, [Saxon] says that you owe

$6,197.70 to bring your mortgage up to date (or 'reinstate' your mortgage).   You must

pay this amount, plus interest and other costs, to keep your house from going through a

sheriff's sale." (*Id.*, Ex. P at 62.)  The notice advised Nelson to contact Saxon as soon as possible "to talk about things you might be able to do to prevent foreclosure." (*Id.*)

Under the original Mortgage, Nelson had a right to reinstate his loan after acceleration.  (First Steinlage Aff., Ex. B at 57.)  Specifically, the Mortgage provided that:

> If Borrower meets certain conditions, Borrower shall have the right to have enforcement of this Security Instrument discontinued at any time prior to the earliest of: (a) five days before sale of the Property pursuant to any power of sale contained in this Security Instrument; (b) such other period as Applicable Law might specify for the termination of Borrower's right to reinstate; or (c) entry of a judgment enforcing this Security Instrument. Those conditions are that Borrower: (a) pays Lender all sums which then would be due under this Security Instrument and the Note as if no acceleration had occurred; (b) cures any default of any other covenants or agreements; (c) pays all expenses incurred in enforcing this Security Instrument, including, but not limited to, reasonable attorneys' fees, property inspection and valuation fees, and other fees incurred for the purpose of protecting Lender's interest in the Property and rights under the Security Instrument; and (d) takes such action as Lender may reasonably require to assure that Lender's interest in the Property and rights under this Security Instrument, and Borrower's obligation to pay the sums secured by this Security Instrument, shall continue unchanged.

(*Id.*)

## VII.  REINSTATEMENT AMOUNT

Nelson claims that he contacted and spoke with Saxon representatives on nearly a daily basis during the month of September 2011 in an attempt to obtain the amount required to reinstate the loan and avoid foreclosure.   (Nelson Dep. at 106:5-12.) According to Saxon's records, Saxon tried to contact Nelson by telephone repeatedly during the month of September with no success, and Nelson did not contact Saxon until

September 23, 2011. (First Steinlage Aff., Ex. L at 12-15; *id.*, Ex. H at 38.) When asked to identify on a calendar the dates on which he spoke with Saxon representatives, Nelson marked September 1, 2, 21, 22, 23, 26, 27, 28, 29, and 30. (Nelson Dep. 122:25-123:25; Third Aff. of Michael J. Steinlage, Ex. W, Apr. 25, 2013, Docket No. 31.)

The parties agree that Nelson spoke with Saxon representatives by telephone on September 23, 2011, and informed Saxon that he wanted to reinstate the loan. (First Steinlage Aff., Ex. H at 38.) Saxon advised Nelson that the amount necessary to reinstate the loan was $9,165.28 plus yet to be determined attorney's fees and costs, which Saxon would request from foreclosure counsel and provide to Nelson. (*Id.*; First Eaton Aff., Ex. P at 52-53.) The $9,165.28 reinstatement figure included $7,337.54 in missed payments (from March 2011 through September 2011), $112.26 in late charges, $2,201.24 in recoverable corporate advances, less a $485.76 credit held from Saxon's May 2, 2011 payment. (First Steinlage Aff., Ex. Q; *id.*, Ex. H at 34-35.)

Saxon alleges that it called Nelson on September 26, 2011. (First Steinlage Aff., Ex. L at 11-12.) During this phone call, Saxon informed Nelson that he owed attorney's fees of $700 and costs of $1,239 in addition to the $9,165.28 due under the loan. (*Id.*, Ex. L at 12; *id.*, Ex. H at 35.) Saxon therefore told Nelson that the total amount to reinstate the loan was $11,104.28.[10] (*Id.*, Ex. H at 34-35.) Nelson testified that he never

---

[10] Saxon's brief indicates the payoff amount was $11,104.24. (Def.'s Mem. in Supp. of Mot. for Summ. J. at 8, Mar. 21, 2013, Docket No. 17.) Adding the original reinstatement amount to the fees and costs listed by Saxon, however, yields $11,104.28. This is the amount stated in the record documents.

received such a phone call and was not informed of the payoff amount on September 26, 2011.  (Nelson Dep. 112:20-114:4.)

Instead, Nelson claims that he only received a final reinstatement amount on September 29, 2011, when he called Saxon to ask for the amount necessary to reinstate the loan.  (First Steinlage Aff., Ex. L at 10-11.)   In response, Saxon faxed a letter to Nelson which identified the total reinstatement figure at $11,104.28.  (First Steinlage Aff., Ex. Q; Nelson Dep. 112:20-113:9.)  The letter stated, "[t]hese are the reinstatement figures for the referenced loan.  Please be advised, we must receive this amount no later than 09-30-11 to stop collection/foreclosure proceedings."  (First Steinlage Aff., Ex. Q.)  The letter provided instructions for acceptable payment options, including overnight mailing and wiring funds.  (*Id.*)  Nelson claims that he had access to sufficient funds to reinstate his loan on that day, but that he could not transfer the funds in time to guarantee that the foreclosure sale would be stopped.  (Nelson Dep. 116:16-117:3; First Steinlage Aff., Ex. L at 9.)   Nelson testified that had he known the appropriate reinstatement amount earlier, he could easily have acquired the money necessary to avoid foreclosure.  (Nelson Dep. 38:11-41:24, 101:2-7, 130:25-132:9.)

## VIII.   SEPTEMBER 2011 REPAYMENT PLAN AND FORECLOSURE

Later on September 29, 2011, the parties entered into a final repayment plan ("September Repayment Plan").  (First Steinlage Aff., Ex. R.)   In the September Repayment Plan, Nelson acknowledged "that the Note is in default" and that he was "unable to pay the defaulted amount of $9,165.28 . . . plus outstanding legal fees,

- 17 -

valuation fees, [and] inspection fees in the amount of $11[,]104.24 to bring the note current." (*Id.*, Ex. R at 72.)  The September Repayment Plan set forth a schedule of payments and required an initial down payment of $5,500 "simultaneous with the execution and delivery of this Agreement" to avoid foreclosure. (*Id.*, Ex. R at 73.)  In the event of Nelson's breach, the September Repayment Plan allowed Saxon "at its sole option" to "continue with the foreclosure action currently in place." (*Id.*, Ex. R at 74.)

Immediately after signing the September Repayment Plan, Nelson sought a written guarantee from Saxon that payment of the $5,500 under the September Repayment Plan would stop the foreclosure sale. (Nelson Dep. 116:6-117:3.)  When Saxon would not provide such a guarantee, Nelson refused to make the payment. (Nelson Dep. 116:23-117:3.)

The foreclosure sale went forward as scheduled on September 30, 2011, and Saxon purchased the Property. (First Steinlage Aff., Ex. P at 66.)  The Property has since been transferred to Fannie Mae, and Nelson continues to reside at the Property pursuant to a settlement agreement with Fannie Mae to stay an eviction action in Minnesota state court.  Nelson makes monthly deposits in the amount of $1,014.24 to the Dakota County District Court in connection with the settlement stipulation. (*See* Nelson Dep. 9:18-24; 12:14-16.)

Nelson filed this action in state court in May 2012 and Saxon removed the case to federal court. (Notice of Removal, May 31, 2012, Docket No. 1.)  Nelson's complaint is essentially based upon two allegations.  First, during the time leading up to foreclosure, Nelson alleges that Saxon failed to provide timely and accurate information regarding the

amount due and payable under the loan, in part because Saxon erroneously applied suspense account funds to Nelson's loan.   Second, once Saxon had begun foreclosure proceedings, Nelson alleges that Saxon failed to provide timely and accurate information regarding the amount required to reinstate the loan.   Based on this alleged conduct, Nelson brings claims for violation of Minn. Stat. § 580.30, negligent misrepresentation, negligence, breach of the duty of good faith and fair dealing, and equitable estoppel. (Notice of Removal, Ex. 1 ("Compl.") ¶¶ 26-64.)   Nelson also seeks to quiet title to the Property and demands an accounting.  (Compl. ¶¶ 65-74.)

## ANALYSIS

## I.   STANDARD OF REVIEW

Summary judgment is appropriate where there are no genuine issues of material fact and the moving party can demonstrate that it is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a).  A fact is material if it might affect the outcome of the suit, and a dispute is genuine if the evidence is such that it could lead a reasonable jury to return a verdict for either party.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  A court considering a motion for summary judgment must view the facts in the light most favorable to the non-moving party and give that party the benefit of all reasonable inferences to be drawn from those facts.  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).   Summary judgment is appropriate if the nonmoving party "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of

proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). "To defeat a motion

for summary judgment, a party may not rest upon allegations, but must produce probative

evidence sufficient to demonstrate a genuine issue [of material fact] for trial." *Davenport*

*v. Univ. of Ark. Bd. of Trs.*, 553 F.3d 1110, 1113 (8th Cir. 2009) (citing *Anderson*, 477

U.S. at 247-49).

## II.    VIOLATION OF MINN. STAT. § 580.30 (COUNT I)

Both Nelson and Saxon seek summary judgment on Nelson's claim for violation

of Minn. Stat. § 580.30. Minnesota Statutes § 580.30 establishes a mortgagor's right to

reinstate a defaulted loan at any time prior to a foreclosure sale by paying to the

mortgagee the defaulted amount due under the loan, in addition to fees and expenses

incurred by the mortgagee in relation to the foreclosure:

> In any proceedings for the foreclosure of a real estate mortgage . . . if at any
> time before the sale of the premises under such foreclosure the mortgagor
> . . . shall pay or cause to be paid to the holder of the mortgage so being
> foreclosed, or to the attorney foreclosing the same, or to the sheriff of the
> county, the amount actually due thereon and constituting the default
> actually existing in the conditions of the mortgage at the time of the
> commencement of the foreclosure proceedings, including insurance,
> delinquent taxes, if any, upon the premises, interest to date of payment, cost
> of publication and services of process or notices, attorney's fees not
> exceeding $150 or one-half of the attorney's fees authorized by section
> 582.01, whichever is greater, . . . together with other lawful disbursements
> necessarily incurred in connection with the proceedings by the party
> foreclosing, then, and in that event, the mortgage shall be fully reinstated
> and further proceedings in such foreclosure shall be thereupon abandoned.

Minn. Stat. § 580.30, subd. 1. Nelson contends that Minn. Stat. § 580.30 creates a right

to reinstatement and thereby "also creates a requirement that a mortgagee provide a

mortgagor with sufficient, timely, information to reinstate his or her mortgage." (Compl.

¶¶ 28-29.)  Nelson alleges that Saxon violated the statute's requirement "[b]y failing to provide Nelson with a reinstatement amount" in a timely manner and "[b]y demanding amounts greater than those actually due . . . on the mortgage." (*Id.* ¶¶ 30-34.)

"[T]o reinstate a mortgage under Minn. Stat. § 580.30, the mortgagor must pay all amounts actually due upon the mortgage at the time of the tender, plus interest on the delinquent payments from the due date to the date of tender and statutory costs." *First Trust Co. v. Leibman*, 445 N.W.2d 547, 552 (Minn. 1989); *see also Davis v. Davis*, 196 N.W.2d 473, 475 (Minn. 1972).  The mortgagee cannot refuse to accept the mortgagor's tendered payment to reinstate a loan pursuant to Minn. Stat. § 580.30. *See In re Petition of Norwest Bank Metrowest Nat'l Ass'n*, 396 N.W.2d 896, 899 (Minn. Ct. App. 1986).

The Court interprets Minnesota's mortgage statutes according to ordinary principles of statutory interpretation, construing words and phrases "according to their plain and ordinary meaning, with the exception of technical words and phrases, which [the Court] construe[s] according to their special meaning." *Ruiz v. 1st Fid. Loan Servicing*, 829 N.W.2d 53, 57 (Minn. 2013).  With respect to § 580.30 in particular the Minnesota Supreme Court has held that because the provision "was adopted in 1923 in response to hardships experienced by mortgagors resulting from the depressed economic conditions of the times," the statute should be "'construed in the light of the legislative purpose to afford the vendee an opportunity to save and reinstate his equitable rights by removing the default.'" *Davis*, 196 N.W.2d at 475 (quoting *Needles v. Keys*, 184 N.W. 33, 34 (Minn. 1921) (discussing a similar statute related to contracts for deed)).  In the event of ambiguity, the Court interprets § 580.30 in a manner that does not increase the

incentive for mortgagors to default, *see Leibman*, 445 N.W.2d at 551, and militates against forfeiture, *see Davis*, 196 N.W.2d at 475.

Additionally, Minnesota courts apply a strict compliance standard to the statutes governing foreclosures by advertisement. *See Ruiz*, 829 N.W.2d at 56. Under this standard, the foreclosing party is required to "'show exact compliance' with the terms of the statutes." *Jackson v. Mortg. Elec. Registration Sys., Inc.*, 770 N.W.2d 487, 494 (Minn. 2009) (quoting *Moore v. Carlson*, 128 N.W. 578, 579 (Minn. 1910)). "If the foreclosing party fails to strictly comply with the statutory requirements, the foreclosure proceeding is void." *Id.*; *see also Radel v. Plath*, No. C9-88-1441, 1989 WL 17598, at *2 (Minn. Ct. App. Mar. 7, 1989) (affirming the trial court's decision to set aside a mortgage foreclosure sale on the ground, among others, that the mortgagee demanded an excessive amount for reinstatement under Minn. Stat. § 580.30). With these principles of interpretation in mind, the Court turns to Nelson's allegations.

### A. Timeliness

The Court must first determine whether Minn. Stat. § 580.30 imposes a duty upon a mortgagee to **timely** provide a mortgagor with the amount required to reinstate a loan prior to foreclosure. Nelson alleges that Saxon breached § 580.30 because it did not provide Nelson with the complete reinstatement amount of $11,104.28 until September 29, 2011 – the day before the foreclosure sale was scheduled to occur. (Compl. ¶ 32.) Nelson claims that had he known the reinstatement amount earlier he would have had time to gather sufficient funds to make the payment.

Whether § 580.30 imposes a duty upon a lender to provide a mortgagor with information about the amount required to reinstate a loan within a particular timeframe prior to foreclosure is a question of first impression in Minnesota.  The Court's role is to predict how the Minnesota Supreme Court would resolve this unanswered question of state law.  *See AMCO Ins. Co. v. Inspired Techs., Inc.*, 648 F.3d 875, 880 (8th Cir. 2011).  "If the Minnesota Supreme Court has not yet addressed the issue, [the federal court] may consider 'relevant state precedent, analogous decisions, considered dicta, . . . and any other reliable data,' including intermediate appellate court decisions if they are the 'best evidence' of state law, to predict how the highest court of the state would resolve the issue."  *Gage v. HSM Elec. Prot. Servs., Inc.*, 655 F.3d 821, 825 (8th Cir. 2011) (quoting *Praetorian Ins. Co. v. Site Inspection, LLC*, 604 F.3d 509, 516 n.13 (8th Cir. 2010)).

The plain language of § 580.30 does not impose a duty upon mortgagees to provide a mortgagor with information about the amount necessary to reinstate a loan within a specific timeframe.  *See* Minn. Stat. § 580.30, subd. 1.[11]  Section 580.30 does, however, provide a mortgagor with an absolute right to reinstatement upon payment of

---

[11]  Notably, subdivision 2 of § 580.30, governing a sheriff's request for information about the reinstatement amount, does provide a specific timeframe.  The statute provides that "[u]pon written request by the sheriff, the holder of the mortgage or the holder's legal representative shall provide to the sheriff within seven days of the date of the request by the sheriff to the foreclosing attorney . . . the current payoff amount, showing outstanding principal, interest, and a daily interest accrual amount, [and] an itemized schedule of the current amounts necessary to reinstate the mortgage."  Minn. Stat. § 580.30, subd. 2.  Although this provision could be read to suggest that the Minnesota Legislature did not intend to impose a similarly specific timeline with respect to reinstatement under subdivision 1, it is not dispositive on the question of what a mortgagee must do in order to allow a mortgagor to vindicate his reinstatement right "at any time" before the foreclosure sale under subdivision 1.

amounts actually in default at any time prior to the foreclosure sale.  *See Davis*, 196

N.W.2d at 475.  This statutory right would be meaningless if a lender could simply refuse

to provide the borrower with the amount required to reinstate the loan, or provide the

amount long after the borrower had requested a reinstatement amount, while additional

fees continue to accrue, and thereby frustrate a borrower's right to reinstate "at any time."

Therefore, to give full effect to the statute's purpose of affording the mortgagor "an

opportunity to save and reinstate his equitable rights by removing the default," *id.*

(internal quotation marks omitted), the Court concludes that a lender must have **some**

duty regarding the timeliness with which reinstatement information is communicated

such that the lack of timeliness does not prevent a borrower from exercising his statutory

right to reinstate the loan.

　　　In defining the nature of this duty, the Court recognizes the need to strike an

appropriate balance between the interests that are in tension under the statutory scheme

created by § 580.30.  On the one hand, the statute bestows on the borrower an absolute

right to reinstate at any time prior to foreclosure, which requires the borrower to be able

to obtain prompt and accurate information about the reinstatement amount.  Furthermore,

under Section 580.30, the borrower is entitled to exercise this right to reinstate **at any**

**time** before foreclosure, indicating that the borrower must be able to obtain an accurate

reinstatement amount upon request at any point in time prior to foreclosure.  On the other

hand, the obligations imposed upon the lender by the statute must take into account the

reality that during the period leading up to foreclosure the lender may be unable

immediately to provide a borrower with an absolutely certain reinstatement amount at

any particular point in time due to the existence of fees assessed by third parties and the continually accruing nature of certain loan charges. The appropriate balance between these competing concerns and the concomitant duty upon a lender are best explained within the context of the facts of this case.

It is undisputed that on September 23, 2011, Nelson contacted Saxon and indicated that he wished to reinstate his loan. At that time, Saxon was unable to, and did not, provide Nelson with the total amount required to reinstate his loan. Saxon did notify Nelson that the amount required to reinstate the loan would be $9,165.28,[12] but could not give him a final amount for the foreclosure fees and costs that Saxon would request from foreclosure counsel. This information was insufficient to allow Nelson to exercise his statutory right to reinstate the loan.[13]

---

[12] The Court will discuss the accuracy of this amount in the following section, but is concerned here only with the timeliness with which Saxon provided the information.

[13] This case does not require the Court to decide the slightly different statutory question of whether, if Saxon had told Nelson that his reinstatement amount was $9,165.28 on September 23, 2011, and he had paid that amount, it would have amounted to a violation of § 580.30 for Saxon to later demand additional amounts for foreclosure associated costs. In the present case, the Court concludes that § 580.30 cannot be read to require a borrower to make piece-meal reinstatement payments based on information learned from the lender in order to bring a claim for violation of the statute. In other words, Nelson was not required to pay the $9,165.28 (a figure that was timely provided under the statute) which Saxon informed him was only a partial reinstatement figure, in order to preserve his right to bring a claim under § 580.30. By providing the borrower with a right to reinstate, the statute also implicitly includes a corresponding right of the borrower to choose whether to reinstate. In order to make an informed choice a borrower must be aware of the full amount of reinstatement or be provided with a reasonably accurate estimate of what the final amount will be. For example, if a borrower has $8,000 at his disposal and is told by the lender that he owes at least $5,000 plus yet to be determined fees and costs, the borrower has insufficient information to determine whether he will be able to reinstate, i.e. whether the total amount of reinstatement will be $8,000 or less. If the borrower is required first to pay the $5,000 in order to vindicate his statutory right to reinstate

(Footnote continued on next page.)

Saxon claims that it provided Nelson with the amount of the fees and costs, and the total reinstatement amount, three days later, on September 26.  The Court finds that this three-day delay in providing Nelson with a reinstatement amount could have prevented Nelson from exercising his statutory right to reinstate his loan "at any time" prior to foreclosure, and therefore was untimely under the statute.[14]

Under the statute, a lender must be prepared to provide a borrower with an accurate and complete reinstatement figure at any time prior to foreclosure.  However, at the moment of a borrower's inquiry, certain fees and costs associated with foreclosure may have been assessed by third parties and may be unknown to the bank or certain late fee and interest charges may be too complicated to be calculated by a customer service representative.  A lender therefore cannot be obligated to provide a reinstatement figure immediately.  Instead, the Court concludes that, after notice of a foreclosure sale has been served, the lender must provide a borrower with an accurate and complete reinstatement figure within twenty-four hours of a borrower's request in order to allow a borrower to

_____

(Footnote continued.)

and fees and costs should later amount to more than $3,000 the borrower will have spent $5,000 for no purpose – his house will still be foreclosed upon.  Therefore, the statutory duty imposed on the lender to timely provide information must refer to the entire reinstatement amount for which a borrower is responsible.

[14] Nelson contends that he did not receive the final reinstatement amount until September 29.  Because the Court finds that receiving the reinstatement amount on September 26 was untimely under the statute, receipt of the information on September 29 would also have been untimely.

vindicate his statutory right to reinstate his loan "at any time" prior to foreclosure.[15]   The

Court finds that a twenty-four hour period in which to gather the necessary information

strikes an appropriate balance between the buyer's right to reinstate and the burden on the

lender to provide accurate reinstatement amounts.   Requiring a lender to provide a

borrower with information within twenty-four hours is consistent with the statutory

purpose of providing the mortgagor with an opportunity to reinstate his loan, *see Davis*,

196 N.W.2d at 475, and does not increase the incentive for mortgagors to default, *see*

*Leibman*, 445 N.W.2d at 547.   Saxon's view – that a lender has no obligation to provide a

borrower with timely information about a reinstatement amount – is an interpretation of

the statute that would increase the instances of forfeiture, rather than militating against

them.   *See Davis*, 196 N.W.2d at 475.   Furthermore, the Court notes that the burden

placed upon lenders to obtain information within twenty-four hours is relatively slight.

First, by requiring the borrower to make a reinstatement request, the lender is not

required to guess when, in the period of time between service of a notice of foreclosure

and an actual foreclosure sale, a borrower might wish to exercise his statutory right to

reinstatement and therefore require the reinstatement information.   Second, all of the

information relevant to determining a reinstatement amount is within the lender's control.

Account information kept by lenders should already include the principal, interest, and

---

[15]   Because Nelson essentially requested a reinstatement figure only once after being served with notice of the foreclosure sale, the Court need not decide whether a lender's obligation to provide a reinstatement figure may terminate where a borrower repeatedly requests and receives an accurate reinstatement figure and fails to reinstate the loan.   A lender can also decrease the necessity of repeated reinstatement requests by informing the borrower of the time period for which a particular reinstatement amount is valid.

escrow balances as well as late fees.  If lenders find that it is too difficult to obtain information about fees and costs from foreclosure counsel, they can negotiate flat fees or base their calculation of reinstatement amounts upon the statutory attorneys' fees allowed by § 580.30.[16]

Although the Court concludes that Saxon did not provide timely reinstatement information to Nelson, that conclusion does not end the Court's inquiry as to whether Saxon violated § 580.30.  Section 580.30 protects a borrower's right to reinstate his loan at any time prior to foreclosure, and any statutory duty imposed upon a lender must be in furtherance of that right.  Therefore, where a lender's failure to timely provide reinstatement information did not prevent or substantially frustrate a borrower's right to reinstate, that conduct does not amount to a violation of the statute.  In other words, in order to have violated § 580.30 by prohibiting a borrower from exercising his statutory right to reinstate, the lender's failure to timely provide a reinstatement amount must have been the cause of a borrower's inability to reinstate his loan.  A lender will not be liable, for example, if the borrower could not have reinstated his loan in any case due to an insufficiency of funds.

---

[16] Notably, as explained more fully below, nothing in § 580.30 prevents a lender from accepting less than the full reinstatement amount in order to reinstate a loan.  Therefore, if a lender is unwilling or unable to obtain an accurate reinstatement amount within twenty-four hours, it can provide the borrower with a reinstatement amount that the lender will accept based upon an estimate of the fees and costs that have been incurred that the lender knows will not exceed the actual reinstatement amount.

Under these circumstances, the Court finds that a reasonable jury could conclude that Saxon violated Minn. Stat. § 580.30 by failing to provide Nelson with the amount required to reinstate his loan within a reasonable period of time.  But a reasonable jury could also find that Nelson could not have obtained the $11,104.28 necessary to reinstate his loan even had he learned of the reinstatement amount on September 23, and therefore conclude that Saxon's failure to provide Nelson with timely reinstatement information was not the cause of his inability to reinstatement.  Because genuine issues of material fact remain regarding whether Saxon's failure to timely provide the reinstatement amount was the cause of Nelson's failure to reinstate, the Court will deny both motions for summary judgment with respect to this aspect of Nelson's § 580.30 claim.

### B.      Demand for Excessive Amount

The Court must next determine whether Saxon violated Minn. Stat. § 580.30 by demanding an amount in excess of the amount actually due under the terms of the loan. Nelson alleges that Saxon incorrectly applied suspense account funds, and therefore Saxon demanded an amount to reinstate the loan was greater than the amount that would have been required to reinstate had Saxon correctly applied the suspense account funds. To analyze Saxon's claim the Court must determine whether Saxon misapplied Nelson's suspense account funds and whether that misapplication resulted in Saxon demanding an amount in excess of what Nelson should have owed on the loan had the funds been

applied correctly.[17]  If Saxon did not misapply the funds, it could not have demanded an

amount that was in excess of what Nelson actually owed.  And if it misapplied the funds,

but did so in a manner that did not result in Nelson owing more at the time of foreclosure

than he would have if the funds had been applied properly, that misapplication cannot

have hindered Nelson's ability to exercise his right to reinstate under the statute, and

therefore cannot form the basis of a claim for violation of § 580.30.[18]

---

[17] The Court notes that Saxon has never provided the Court with an accurate figure for
the amount of funds that were held in Nelson's suspense account on October 21, 2010, when the
Loan Modification was booked.  Nor has Saxon indicated from which of Nelson's previous
payments those funds came.  At oral argument, for example, counsel for Saxon represented that
the amount in the suspense account as of October 21, 2010 was probably $1,014.24 + $2,085.76
(the amount used to make Nelson's December 2010 payment and then reduce his principal
balance), but then conceded that that could not be the correct amount, as that number failed to
account for the $221.26 payment out of the suspense account reflected on the November 1, 2010
bill.  Additionally, there was some suggestion that the amounts held in Nelson's suspense
account on October 21, 2010, were from the $2,600 and $1,273 payments made by Nelson in
September 2010.  But according to Saxon's records only $3,321.26 was taken from the suspense
account fund and applied to Nelson's account on October 25, 2010.  If both September payments
were held in the suspense account the total in the account should have been $3,873, leaving
$551.74 unaccounted for in Saxon's calculation.  Nelson does not, however, argue that the
amount of funds Saxon applied out of his suspense account fund was inaccurate.  Instead, Nelson
argues only that the manner in which the funds were applied was inaccurate.  Accordingly, the
Court will examine only the manner in which Saxon applied the funds, and assume, for purposes
of this motion that Saxon held the correct amount of funds in the suspense account.

[18] Because the Court ultimately finds that Saxon did not demand a reinstatement amount
in excess of the amount actually due under the terms of the loan, it will assume, without
deciding, that an excess demand would constitute a violation of § 580.30, even though that
question is not settled under Minnesota law.  Nelson cites *Radel v. Plath*, No. C9-88-1441, 1989
WL 17598 (Minn. Ct. App. Mar. 7, 1989), as authority for the proposition that it is always
violation of Section 580.30 for a lender to demand an amount in excess of what is actually owed
on a loan, and requires that the foreclosure be set aside.  In *Radel*, the court did set aside a
foreclosure sale, at least in part, on the grounds that the lender demanded an excessive amount
for reinstatement including certain penalties for late payments.  *Id.* at *2.  But in *Radel*, the court
first found that the mortgage at issue was not in default at all.  *Id.*  The court concluded that the
foreclosure sale was void because no default had occurred, and the penalties assessed for late
payments as part of the reinstatement figure were inappropriate under the loan – and therefore

(Footnote continued on next page.)

### 1.   Timing of Suspense Account Fund Application

As an initial matter, the Court must determine whether Saxon applied Nelson's suspense account funds at an appropriate time when it applied them to Nelson's loan several days before the Loan Modification became effective.   Nelson argues that Saxon was required to wait until November 1 when the Loan Modification became effective – the date by which Nelson's account should have reflected that no amount was owing on his loan – to apply the funds from his suspense account.   (Pl.'s Reply at 7, Apr. 25, 2013, Docket No. 32.)   By applying the suspense account funds on October 25 to reduce his principal balance to $210,418.27, Nelson contends that Saxon breached the Loan Modification, which provided that Nelson's principal balance would be $212,897.50 on November 1.   The timing of the application is relevant to Nelson's claims because on November 1 the $2,278 in fees incurred by Saxon had been charged to Nelson's account. Thus, had Saxon waited to apply the suspense account funds it would have applied them first to those fees, pursuant to the priority dictated in the Mortgage, rather than to reduce Nelson's principal balance.

Although the Court is sensitive to Nelson's confusion about the status of his loan due to Saxon's perplexing practice of implementing modifications to a loan prior to the

_____

(Footnote continued.)

had never been due at all – because the borrowers had timely made their payments.  *Id.  Radel* dealt with a different question than the one presented here – whether, when a borrower is undisputedly in default on his loan a miscalculation in the reinstatement amount by the lender can be the basis for a violation of Section 580.30.  As explained above, the Court need not resolve this question based on the facts presented.

effective date of the modification agreement, the Court finds that Saxon was not required to wait until November 1 before applying Nelson's suspense account funds.  Saxon's conduct as evidenced by the record in this case could certainly suggest that Saxon provided less than satisfactory loan servicing.  However, the question before the Court is a narrow one – whether Saxon misapplied Nelson's suspense account funds and did so in a manner that resulted in a request for an excessive reinstatement amount at the time of foreclosure.

Under the terms of the original Mortgage, Saxon retained discretion to apply suspense account funds **whenever** it chose, and was not required to wait until the loan was current before applying such funds.  Specifically, the Mortgage provided that

> Lender may accept any payment or partial payment or partial payment insufficient to bring the Loan current . . . but Lender is not obligated to apply such payments at the time such payments are accepted. . . . Lender **may** hold such unapplied funds until Borrower makes payment to bring the Loan current.  If Borrower does not do so within a reasonable period of time, Lender **shall either apply such funds** or return them to Borrower.

(First Steinlage Aff., Ex. B at 51 (emphasis added).)  This provision grants Saxon almost complete discretion with regard to when it applies suspense account funds.  Specifically, the provision allows Saxon to apply funds immediately if it chooses, hold funds until the loan becomes current if it chooses, and apply funds, even if the borrower has failed to bring the loan current.  Because the Mortgage does not make the application of suspense account funds appropriate only in the event that the loan is brought current, Saxon did not apply the funds at an inappropriate time when it applied them several days before the Loan Modification was to become effective.

Nelson's argument conflates the terms of the Loan Modification with the terms of the original Mortgage.  Only the latter govern Saxon's application of suspense account funds.  As explained above, the Mortgage controlled application of suspense account funds and Saxon did not breach the Mortgage when it applied the funds on October 25.  It is true that by applying the funds on October 25 Saxon likely breached the terms of the Loan Modification by adjusting the principal balance of Nelson's loan to reflect an amount other than the agreed upon value as of November 1.  But that breach of the Loan Modification, in and of itself, did not cause any of the alleged damage under § 580.30 of which Nelson complains.  In other words, the breach that Nelson has identified (the fact that Nelson's principal balance was lower than anticipated as of November 1) did not increase the amount that was required to reinstate his loan immediately prior to foreclosure.  The action that affected the amount required to reinstate Nelson's loan was the application of suspense account funds on October 25, and that action was taken in accordance with the terms of the Mortgage, and thus accurately reflects "the default actually existing in the conditions of the mortgage" at the time of the foreclosure.  *See* Minn. Stat. § 580.30, subd. 1.

## 2.        Manner of Suspense Account Fund Application

Having determined that Saxon applied the suspense account funds at an appropriate time under the Mortgage, the Court must go on to consider whether Saxon applied those funds in an appropriate manner.  Saxon concedes that it was required to apply the funds pursuant to the payment priority provided for under the original Note and

Mortgage. Under this priority, payments were to be applied to interest due, principal due, and then escrow amounts. (First Steinlage Aff., Ex. B at 51.) Any remaining amounts were to be applied first to late charges, second to any other amounts due, "and then to reduce the principal balance of the Note." (*Id.*) But Saxon did not apply the suspense account funds in this manner. Saxon applied Nelson's suspense account funds on October 25, 2010, when no amounts were due on Nelson's loan. Saxon first applied $1,014.24 in funds to satisfy Nelson's December 2010 payment under the Loan Modification, and then applied $2,085.76 to reduce the principal balance on Nelson's loan. The interest, principal, and escrow amounts in the $1,014.24 payment were not, however, due under the loan on October 25, 2010.[19] Therefore, under the priority scheme, the funds should not have been applied to them. Because no amounts were owing on Nelson's loan Saxon should have applied $3,100 – the entire balance of Saxon's suspense account funds applied on October 25 – to reduce his loan's principal.

---

[19] The Court notes that determining whether the suspense account funds were misapplied requires an understanding of when a particular interest, principal, or escrow payment is "due" for purposes of the priority system under the original Mortgage. The parties have not indicated when a payment becomes "due" for purposes of Nelson's loan. Based upon the billing documents produced in this case, it appears that a payment can properly be characterized as "due" once the borrower has been billed for the payment. In other words, the December 1, 2010 payment did not become due until November 1, 2010, when a statement would have been sent to Nelson reflecting that a payment was due. Presumably if a borrower submitted a payment on November 20 in response to a statement reflecting that a certain amount was "due" on December 1, Saxon would be in compliance with the terms of the Mortgage if it applied such a payment to the principal, interest, and escrow amounts reflected in the statement. Because the Court concludes that any misapplication of suspense account funds is irrelevant for purposes of Nelson's § 580.30 claim, the Court's understanding of when a payment becomes due is not critical to the disposition of these motions.

On November 1, 2010, Saxon again applied funds from Nelson's suspense account, and again did so contrary to the requirements of the Mortgage's priority system. On November 1, Nelson owed $2,278 in foreclosure fees[20] that had been charged to his account on October 27 and 28. Also on November 1, Nelson made a payment of $1,273. Rather than applying that payment to the outstanding fees, as dictated by the priority system, Saxon applied $1,014.24 of this amount to Nelson's January 2011 payment under the Loan Modification. Saxon later applied the remaining $258.76 to the outstanding fees. Because Saxon did not follow the priority system required by the Mortgage, it erroneously applied Nelson's suspense account funds.

---

[20] Nelson argues that the Loan Modification required Saxon to capitalize these fees into the principal balance of his loan. As support for the proposition that the Loan Modification required Saxon to capitalize all fees incurred prior to November 1, 2010, into the principal amount of the loan, Nelson cites a paragraph from the Loan Modification which provides that "[a]ll costs and expenses incurred by Lender in connection with this Agreement, including recording fees, title examination, and attorney's fees, shall be paid by the Borrower and shall be secured by the Security Instrument, unless stipulated otherwise by Lender. (First Steinlage Aff., Ex. F at 14 (cited by Pl.'s Mem. in Opp. to Mot. for Summ. J. at 6, Apr. 11, 2013, Docket No. 24).) This provision refers only to fees that are incurred in connection with the Loan Modification, and therefore does not apply to the foreclosure fees incurred by Nelson prior to the Loan Modification. Additionally, the provision cited by Nelson merely allows Saxon to recover any fees incurred in connection with the Loan Modification by foreclosing on the mortgage; it does not require that those fees be capitalized into the principal balance. Instead, the terms of the Loan Modification indicated that the parties had agreed to a new principal balance of $212,897.50 which included "the unpaid amount(s) loaned to Borrower by Lender plus any interest and other amounts capitalized." (First Steinlage Aff., Ex. F at 13.) Although the Loan Modification indicates that some amounts had been capitalized, this language does not indicate that Saxon was required to capitalize any other fees that would be charged to Nelson's account between the date the parties signed the Loan Modification and its effective date. Accordingly, the Court finds nothing improper in Saxon's failure to capitalize the $2,278 in foreclosure fees into Nelson's principal balance.

### 3.   Effect of Misapplied Funds on Reinstatement Amount

Even if Saxon applied the funds in a manner contrary to the terms of the Mortgage or Loan Modification, Nelson must still show that the application of the funds materially affected his right to reinstatement under the statute.  In other words, if a lender requests an amount to reinstate the loan that is in excess of the amount actually owed it could prevent a borrower from exercising his right to reinstate and thus constitute a violation of the statute.  *See* Minn. Stat. § 580.30, subd. 1 (conditioning a borrower's reinstatement of a loan on paying "the amount actually due" on the loan "constituting the default actually existing in the conditions of the mortgage at the time of the commencement of the foreclosing proceedings"); *cf. Radel v. Plath*, No. C9-88-1441, 1989 WL 17598, at *2 (Minn. Ct. App. Mar. 7, 1989) (affirming the trial court's determination that a foreclosure should be set aside because the borrower "demanded an excessive amount for reinstatement" by demanding penalties and attorney fees that were not properly assessed under the terms of the mortgage).  However, the Court finds that if a lender makes an error in calculating a reinstatement amount and thereby requests an amount that is less than the amount actually due and owing under the loan, that error has not negatively impacted the borrower's statutory right to reinstatement and therefore cannot form the basis for a lender's liability under § 580.30.  In other words, if Saxon's error did not result in a request for reinstatement that was in excess of what Nelson actually would have owed, the error in application was essentially harmless, and Nelson cannot prevail on his claim that Saxon prevented him from exercising his statutory right to reinstate by demanding an excessive amount to reinstate his loan.  Because the Court concludes that

misapplication of the suspense account funds did not result in Nelson owing a greater amount at the time of foreclosure, Saxon cannot be liable for violation of § 580.30.

No later than September 29, 2010, Saxon provided the following calculation for Nelson's reinstatement figure:

| | |
|---|---|
| Payments due: | $7,337.54 |
| Late Charges: | $112.25 |
| Legal fees: | $1,939.00 |
| Recoverable Corporate Advances: | $2,201.24 |
| Total Suspense (Credit): | ($458.76) |
| **TOTAL AMOUNT DUE:** | **$11,104.28** |

The "payments due" consisted of payments due for the months of March 2011 ($1,014.24), April 2011 ($1,014.24), May 2011 ($1,014.24), June 2011 ($1,014.24), July 2011 ($1,014.24), August 2011 ($1,133.17),[21] and September 2011 ($1,133.17).[22]

If Saxon had correctly applied Nelson's suspense account funds on October 25, 2010 Saxon should have applied the entire $3,100 to reduce Nelson's principal balance, instead of first applying $1,014.24 to satisfy Nelson's December 2010 payment. Additionally, Saxon should have applied Nelson's November 1, 2010 payment of $1,273

---

[21] It is unclear from the terms of the Loan Modification why Nelson's monthly payment amount changed in August 2011.  Nelson has not disputed this aspect of the reinstatement amount.

[22] Saxon appears to have applied Nelson's May 2, 2011 payment of $1,500 to satisfy his February 2011 payment of $1,014.24.  The remainder of the May 2, 2011 payment is reflected as the $458.76 total suspense credit in the reinstatement figure.  Nelson does not appear to dispute this application of suspense account funds.  At the time that Saxon applied the $1,500, the February 2011 principal, interest, and escrow payment was due and owing, making it first in priority under the Mortgage.

to reduce the $2,278 in foreclosure fees that had been charged to Nelson's account on October 27 and 28, instead of applying the funds to satisfy Nelson's January 2011 payment. Had Saxon applied the funds in this manner, the "Recoverable Corporate Advances" component[23] of his reinstatement figure would have been $928.24 ($2,201.24 minus $1,273). However, had Saxon applied the funds in this manner, at the time of foreclosure Nelson would have additionally owed his December 2010 and January 2011 payment under the Loan Modification (which the suspense account funds were wrongly applied to). This would add $2,028.48 to the "Payments due" portion of Nelson's reinstatement figure for a total of $9,366.02 ($2,028.48 plus $7,337.54). Therefore, if Saxon had applied Nelson's suspense account funds in the proper order of priority, the reinstatement figure would have been:

| | |
|---|---|
| Payments due: | $9,366.02[24] |
| Late Charges: | $112.25 |
| Legal fees: | $1,939.00 |
| Recoverable Corporate Advances: | $928.24 |
| Total Suspense (Credit): | ($458.76) |
| **TOTAL AMOUNT DUE:** | **$11,886.75** |

---

[23] The parties do not appear to dispute that the $2,278 in foreclosure fees charged to Nelson's account on October 27 and 28 appear as some of the Recoverable Corporate Advances in the reinstatement figure.

[24] This calculation of payments includes monthly payments for December 2010, January 2011, March 2011, April 2011, May 2011, June 2011, July 2011, August 2011, and September 2011. In actuality, if Saxon had applied suspense account funds accurately, it would have applied Nelson's May 2, 2011 payment to satisfy the December 2010 payment rather than the February 2011 payment, but the amount required for reinstatement would remain the same.

According to this calculation, had Saxon applied the suspense account funds according to the Mortgage's priority, Nelson's true reinstatement figure would have been **$782.47 greater** than the amount Saxon in fact demanded for reinstatement ($11,886.75 minus $11,104.28). Therefore, although Saxon misapplied Nelson's suspense account funds, Saxon did not demand a reinstatement amount in excess of what Nelson actually owed under the loan and therefore did not hinder Nelson's ability to exercise his statutory right to reinstate. Accordingly, the Court concludes that Saxon could not have violated Minn. Stat. § 580.30, and will grant summary judgment in Saxon's favor on this claim.

## III.   BREACH OF GOOD FAITH AND FAIR DEALING (COUNT IV)

Nelson alleges that Saxon breached the covenant of good faith and fair dealing under the Loan Modification generally by interfering with Nelson's performance and preventing him from tendering the payment necessary to reinstate his mortgage. (Compl. ¶¶ 54-55.)[25] Both Saxon and Nelson move for summary judgment on this claim.

"Under Minnesota law, every contract includes an implied covenant of good faith and fair dealing requiring that one party not 'unjustifiably hinder' the other party's performance of the contract." *In re Hennepin Cnty. 1986 Recycling Bond Litig.*, 540 N.W.2d 494, 502 (Minn. 1995) (quoting *Zobel & Dahl Constr. v. Crotty*, 356 N.W.2d 42,

---

[25] It is unclear why Nelson chose not to pursue an express breach of contract theory based upon, for example, Saxon's failure to comply with the terms of the Loan Modification by "booking" Nelson's loan prior to the effective date of the agreement or Saxon's failure to appropriately apply suspense account funds. Nelson's counsel repeatedly confirmed at oral argument that the breach of contract claim asserted was solely for breach of the implied covenant of good faith and fair dealing.

45 (Minn. 1984)).  "[T]he implied covenant of good faith and fair dealing governs the parties' performance and prohibits a party from failing to perform for the purpose of thwarting the other party's rights under the contract." *Team Nursing Servs., Inc. v. Evangelical Lutheran Good Samaritan Soc'y*, 433 F.3d 637, 641-42 (8th Cir. 2006). When one party breaches the duty of good faith and fair dealing and unjustifiably hinders the other party's performance, the other party's performance under the contract is excused. *Zobel*, 356 N.W.2d at 45.  The implied duty of good faith and fair dealing extends only "to actions within the scope of the underlying enforceable contract." *Cox v. Mortg. Elec. Registration Sys., Inc.*, 685 F.3d 663, 670 (8th Cir. 2012).  But a plaintiff "need not first establish an express breach of contract claim" in order to establish breach of the implied duty, as "a claim for breach of an implied covenant of good faith and fair dealing implicitly assumes that the parties did not expressly articulate the covenant allegedly breached." *In re Hennepin Cnty.*, 540 N.W.2d at 503.

### A.    Demand for Excessive Payments

Nelson argues that Saxon hindered his ability to make payments under the terms of the Loan Modification by demanding monthly payments in excess of what was actually due.  Specifically, Nelson argues that because Saxon incorrectly applied the suspense account funds, the amount owing each month was greater than the amount that would have been owing had Saxon correctly applied the suspense account funds.

As explained above, *supra* Section II.B.2, the undisputed facts demonstrate that Saxon did misapply the Nelson's suspense account funds according to the priority

provision in the original Mortgage.  The misapplication of funds did not change the ultimate amount for which Nelson was responsible, but rather shifted the type of payments for which he was responsible.  In other words, if Saxon had not used his suspense account funds to satisfy Nelson's December and January payments he would have owed those amounts instead of the attorney's fees and costs that were assessed to his account in October.  Because Saxon's misapplication of the suspense account funds did not result in Nelson owing monthly payments in excess of what he would have owed had the funds been applied properly, Nelson has presented no evidence that the misapplication unjustifiably hindered his ability to perform his obligations under the Loan Modification and the original Mortgage.

Additionally, Nelson must establish "a causal link between the alleged breach and [his] claimed damages" in order to maintain a claim for breach of the duty of good faith and fair dealing.  *See Cox*, 685 F.3d at 671 (internal quotation marks omitted).  Here, Nelson does not allege that Saxon's actions prevented him from performing his responsibilities under the Loan Modification.  Instead, Nelson's position throughout the course of this litigation has been that he, at all times, had the ability to pay the amounts requested of him by Saxon, but that Saxon prevented him from paying by failing to communicate amounts due.  Furthermore, Nelson has presented no evidence that the attorneys' fees assessed to his account (which he argues should have been reduced using suspense account funds) prevented him from performing his contractual obligations by making the monthly principal, interest, and escrow payments that were due under the Loan Modification.  *See id.* at 672 ("Because the homeowners pled no connection

between the lender's failure to respond to their status requests or refusal to release the loan file and the homeowners' failure to perform under the mortgage agreement, thereby causing their damages, they did not adequately plead a cause of action for breach of the duty of good faith and fair dealing based on these actions."). Therefore, the Court will grant Saxon's motion for summary judgment with respect to this aspect of Nelson's claim for breach of the duty of good faith and fair dealing.[26]

### B.  Failure to Provide Timely Information About Reinstatement

Nelson next argues that Saxon breached the implied duty of good faith and fair dealing by failing to timely provide him with information about the amount required to reinstate his loan. By failing to timely provide the information, Nelson argues that Saxon

---

[26] Nelson does not allege – in either his complaint or memoranda in connection with the instant motions – that the other alleged conduct of Saxon, such as failing to accept payments by phone or providing him with confusing information about his loan due date constituted a breach of the duty of good faith and fair dealing. Because any such claims were not pled in the complaint, even if Nelson had raised them in his briefing, the Court would not consider them at this stage. *See N. States Power Co. v. Fed. Transit Admin.*, 358 F.3d 1050, 1057 (8th Cir. 2004) (explaining that parties may not "manufacture claims, which were not pled, late into the litigation for the purpose of avoiding summary judgment"). Even if these claims had been pled the Court would similarly find that Nelson has presented no evidence of a causal connection between these actions and his failure to perform his contractual obligations. For example, Nelson alleges that he breached the May Repayment Plan because Saxon refused to accept a payment by phone. Nelson has presented no evidence, however, that he attempted to make the payment by any of the acceptable methods listed in the May Repayment Plan – cashier's check or bank wire. Although, viewing the evidence in the light most favorable to Nelson, some of Saxon's actions may have inconvenienced Nelson, Nelson has presented no evidence that the actions caused him to be unable to perform his contractual obligation – which was to make payments pursuant to the May Repayment Plan by cashier's check or bank wire. *See Wells Fargo Bank, N.A. v. Boedigheimer*, No. A13-0626, 2013 WL 6569956, at *5 (Minn. Ct. App. Dec. 16, 2013) (affirming the district court's grant of summary judgment dismissing a counterclaim for breach of the implied covenant of good faith and fair dealing where "[a]ppellants claim that they requested records in 2010, but they offer nothing in support of the argument that respondent's failure to respond to that request hindered payment on the account or was somehow a condition precedent to payment").

unjustifiably hindered him from exercising his right to reinstate under the Mortgage.

Under the Mortgage, Nelson had

> the right to have enforcement of this Security Instrument discontinued at any time prior to the earliest of: (a) five days before sale of the Property pursuant to any power of sale contained in this Security Instrument; (b) such other period as Applicable Law might specify for the termination of Borrower's right to reinstate; or (c) entry of judgment enforcing this Security Instrument.

(First Steinlage Aff., Ex. B at 57.)  To exercise this right, Nelson was required to, among other obligations, pay Saxon "all sums which then would be due under this Security Instrument and the Note as if no acceleration had occurred" and "pay[] all expenses incurred in enforcing this Security Instrument, including, but not limited to, reasonable attorneys' fees . . . incurred for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument."  (*Id.*)

Saxon argues that the failure to timely provide Nelson with reinstatement information cannot form the basis of a claim for breach of the duty of good faith and fair dealing because none of the contracts between Saxon and Nelson contained any explicit provision requiring Saxon to provide information or to provide it within a particular period of time.   (*See* Defs.' Mem. in Supp. of Mot. for Summ. J. at 25, Mar. 21, 2013, Docket No. 17 ("Saxon did not refuse to perform its contractual duties.   The reinstatement clause gave Plaintiff the right to stop the foreclosure sale by paying the reinstatement amount within the time frame provided.  It is undisputed that he failed to do so.").)

Some courts in this district have adopted the narrow view of breach of the implied duty of good faith and fair dealing advocated by Saxon, in which the duty can only be enforced based upon an express obligation that exists in the parties' contract.  *See Klosek v. Am. Express Co.*, Civ. No. 08-426, 2008 WL 4057534, at *15-*16 (D. Minn. Aug. 26, 2008) ("The controlling rule here is that the implied covenant does not impose any independent duties on the parties to a contract.  The implied covenant, instead, is an implicit agreement to act in good faith when performing the contract. . . . If a contract does not impose a certain obligation on a party, therefore, that party's failure to perform that obligation cannot be the basis for a violation of the implied covenant."); *see also Teng Moua v. Jani-King of Minn., Inc.*, 810 F. Supp. 2d 882, 893 (D. Minn. Aug. 30, 2011) ("The implied covenant of good faith and fair dealing serves only to enforce existing contractual duties, and not to create new ones." (internal quotation marks omitted)).

The Court finds, however, that the Minnesota Supreme Court's interpretation of the implied covenant of good faith and fair dealing indicates that breach of an express covenant is not required in order for a party to show that his performance has been unjustifiably hindered by the actions of the other party to the contract.  In *Zobel*, the Minnesota Supreme Court affirmed a jury's finding that defendant had breached the duty of good faith and fair dealing where the plaintiff contractor claimed that the defendant had unjustifiably hindered its ability to complete construction of a home, and thereby perform under the contract, by denying plaintiff access to the property unless plaintiff agreed to waive its lien rights.  356 N.W.2d at 45-46.  Although the contract did not

contain an express term that the defendant could not prevent plaintiff from accessing the

property or condition access to property upon a waiver of lien rights, the court found that

those terms were implied in the contract. *Id.*  Similarly, in *In re Hennepin County* the

court held that plaintiffs had stated a claim for breach of the implied covenant of good

faith and fair dealing even if they were unable to establish an express breach of contract

claim.  540 N.W.2d at 503.  The *Hennepin County* court cited with approval the opinion

in *Metropolitan Life Ins. Co. v. RJR Nabisco, Inc.*, 716 F. Supp. 1504 (S.D.N.Y. 1989),

which provided a logical and complete explanation of the nature of an "unjustifiably

hindered" breach of the duty of good faith and fair dealing claims that is useful to

understanding Nelson's claims here:

> A plaintiff always can allege a violation of an express covenant.  If there
> has been such a violation, of course, the court need not reach the question
> of whether or not an **implied** covenant has been violated.  That inquiry
> surfaces where, while the express terms may not have been technically
> breached, one party has nonetheless effectively deprived the other of those
> express, explicitly bargained-for benefits.  In such a case, a court will read
> an implied covenant of good faith and fair dealing into a contract to ensure
> that neither party deprives the other of the fruits of the agreement.  Such a
> covenant is implied only where the implied term is consistent with other
> mutually agreed upon terms in the contract.  In other words, the implied
> covenant will only aid and further the explicit terms of the agreement and
> will never impose an obligation which would be inconsistent with other
> terms of the contractual relationship.  Viewed another way, the implied
> covenant of good faith is breached only when one party seeks to prevent the
> contract's performance or withhold its benefits.  As a result, it thus ensures
> that parties to a contract perform the substantive bargained-for terms of
> their agreement.

*Id.* at 1516-17 (internal citations and quotation marks omitted).

Based on this understanding of Nelson's claim for breach of the implied covenant

of good faith and fair dealing the Court finds that, as with the right to reinstatement

granted by Minn. Stat. § 580.30, Saxon had an obligation under the Mortgage to provide Nelson with the information necessary to exercise his contractual right to reinstate.  In order to reinstate the mortgage, Nelson was required to pay certain amounts that were within Saxon's knowledge.  Therefore, Saxon cannot be allowed to frustrate Nelson's ability to take advantage of the benefit of reinstatement by withholding the amounts from him.   Furthermore, it is consistent with the other terms of the parties' contractual relationships for Saxon to bear the obligation of providing Nelson with the information necessary for him to take advantage of the benefits of the contract, and thus does not run afoul of any of the express terms agreed to by the parties.

Although the undisputed evidence shows that Saxon failed to timely provide Nelson with the information necessary to exercise his contractual right to reinstate his loan at any time prior to foreclosure, as with the statutory claim, Nelson also must prove "a causal link between the alleged breach and [his] claimed damages" in order to prevail on his claim for breach of the duty of good faith and fair dealing.  *See Cox*, 685 F.3d at 671 (internal quotation marks omitted).  Therefore, Nelson ultimately must prove that Saxon's failure to timely provide him with a reinstatement amount was the cause of Nelson's inability to reinstate his loan.  Nelson has presented evidence that, had he known of the reinstatement amount on September 23 when he requested it, he would have had time to acquire funds from a business partner to pay off the loan.  But the record also contains evidence that Nelson consistently failed to make payments to Saxon even when the amounts due under the loan had been provided to him, suggesting that a jury could find his claims about his ability to access more funds not credible.  In light of this

- 46 -

evidence, the Court concludes that a material issue of fact remains regarding whether Saxon's breach of its obligation to provide Nelson with timely reinstatement information caused Nelson's damages – his inability to reinstate his loan.  Accordingly, the Court will deny both motions for summary judgment on Nelson's breach of the duty of good faith and fair dealing claim.

## IV.   NEGLIGENT MISREPRESENTATION (COUNT II)

Saxon seeks summary judgment on Nelson's negligent misrepresentation claim. Nelson claims that Saxon negligently "impliedly or expressly represented that it would provide to Nelson a timely, accurate reinstatement figure for the Mortgage Loan" (Compl. ¶ 37) and generally supplied false information to Nelson regarding amounts due and owing under the loan.[27]

To prevail on a claim for negligent misrepresentation under Minnesota law, Nelson must prove that (1) Saxon owed Nelson a duty of care; (2) Saxon, by its failure to use reasonable care, made a false representation or failed to discover or communicate certain information that an ordinary person in its position would have discovered or communicated; (3) the misrepresentation occurred in the course of Saxon's business or in a transaction in which it had a pecuniary interest; (4) Nelson relied on the information; (5) Nelson was justified in relying on the information; and (6) Nelson was financially harmed by his reliance.  *Noble Sys. Corp. v. Alorica Cent., LLC*, 543 F.3d 978, 985

---

[27] Nelson has withdrawn his allegation that Saxon engaged in negligent misrepresentation in its Help for Homeowners in Foreclosure notice.  (Pl.'s Mem. in Opp. to Def.'s Mot. for Summ. J. at 25 n.7, Apr. 11, 2013, Docket No. 24; *see also* Compl. ¶ 37b.)

(8th Cir. 2008); *Hardin Cnty. Sav. Bank v. Hous. & Redevelopment Auth. of City of Brainerd*, 821 N.W.2d 184, 192 (Minn. 2012); *Williams v. Smith*, 820 N.W.2d 807, 815 (Minn. 2012); *Florenzano v. Olson*, 387 N.W.2d 168, 174 (Minn. 1986).

To establish reliance, a plaintiff must show that he believed the alleged misrepresentation to be true. The listener "may rely on the representation so long as it is not known by the listener to be false and is not obviously false." *Hoyt Props., Inc. v. Prod. Res. Grp., L.L.C.*, 736 N.W.2d 313, 321 (Minn. 2007). "In defending a motion for summary judgment, the nonmoving party must come forward with some evidence demonstrating a genuine issue as to the actual reliance and the reasonableness of the reliance." *Id.* Actual reliance "means that the plaintiff took action, resulting in some detriment, that he would not have taken" if the defendant had not made a misrepresentation, or that the plaintiff "failed, to his detriment, to take action that he would have taken" had the defendant been truthful. *Greely v. Fairview Health Servs.*, 479 F.3d 612, 614 (8th Cir. 2007).

Even assuming that Nelson has satisfied his burden of identifying a material issue of fact with respect to the other elements of negligent misrepresentation, the Court finds that Nelson has failed to put forward evidence creating a genuine issue of fact with respect to his reliance. First, with regard to the alleged misrepresentation that Saxon would provide Nelson with timely and accurate loan information, Nelson has identified no actions he took or would have declined to take, had he known the truth – that Saxon would fail to provide him with timely and accurate loan information. *See Bonhiver v. Graff*, 248 N.W.2d 291, 299 (Minn. 1976) (finding the defendants could be liable for

negligent misrepresentation where plaintiffs relied on the misrepresentations, explaining "it is clear that defendants, in the course of their business, supplied false [accounting] information to American Allied and the commissioner of insurance . . . [and that] these parties relied upon it in determining whether the operation of American Allied could continue").  For example, Nelson does not contend that he would have attempted to switch loan servicers or would have made a more concerted effort to keep track of the payments he made and owed on his loan had he known the truth.  Nor does Nelson contend that had he known Saxon would not provide him with timely and accurate information he would have made his funds more readily accessible, to make payments on a last-minute basis feasible.  In other words, whether or not Saxon had alerted Nelson at the beginning of the loan servicing relationship that it would fail to provide him with timely and accurate information about his loan, Nelson does not contend that the factual circumstances of this case would have been any different.  *See Greeley*, 479 F.3d at 615 (finding that the plaintiff "failed to make a showing of detrimental reliance" because the plaintiff "offered no evidence that he changed his course of action or otherwise relied on the" misrepresentations (internal quotation marks omitted)); *see also In re Digi Int'l, Inc. Sec. Litig.*, 6 F. Supp. 2d 1089, 1103 (D. Minn. 1998) (finding insufficient evidence of actual reliance where the plaintiff "allege[d] generally that it directly or constructively relied," upon the misrepresentations (internal quotation marks omitted)).

That Nelson's allegations do not state a negligent misrepresentation claim is highlighted by the absurdity of the representation his allegations suggest Saxon should have made.  The problem with Saxon's conduct that Nelson has identified is not that

Saxon falsely told Nelson it would provide certain information and then failed to provide that information, but rather that it failed to provide the information.  In other words, Nelson does not seriously claim that he would have been better off had Saxon told him at the beginning of the loan servicing relationship that it would consistently provide him with inaccurate information and would fail to timely inform him of amounts due on his loan.  Instead, Nelson has alleged throughout this litigation that Saxon should have provided him with accurate and timely information, not that Saxon should have told him that it would fail to do so.  Accordingly, Nelson cannot demonstrate the required elements of a negligent misrepresentation claim.

Summary judgment in Saxon's favor with respect to Nelson's second negligent misrepresentation claim is appropriate for similar reasons.  Nelson claims that the figures Saxon provided him regarding the amount due under the loan were incorrect and constituted false representations.  Nelson cannot establish reasonable reliance, however, because he claims to have known that Saxon's representations about the amount due under the loan were false at the time they were made.  For example, when he received the November 2010 statement, Nelson "knew that there was a problem with these dates and fees."  (Pl.'s Mem. in Opp. to Mot. for Summ. J. at 6, Apr. 11, 2013, Docket No. 24.)  Additionally, in May 2011 Nelson claims that he intended to bring his loan current, but could not receive "an accurate number" from Saxon regarding the amount required to reinstatement his loan, and therefore declined to make any payment.  (Nelson Dep. 98:22-23.)  Nelson also testified generally that on numerous occasions when he contacted Saxon he received conflicting information about when his payments were due and the amount of

those payments.  In essence, the premise of Nelson's entire argument is that he **could not** and **did not** rely on the information provided to him by Saxon.  In other words, Nelson claims that he repeatedly failed to make payments on his loan because he did not believe the payoff amounts that Saxon provided to him were correct or accurate.  Therefore, Nelson could not have justifiably relied upon these numbers.  *See Hoyt Props., Inc.*, 736 N.W.2d at 321.  The listener "may rely on the representation so long as it is not known by the listener to be false and is not obviously false."  *Id*.  The Court therefore concludes that Nelson has failed to put forward evidence creating a genuine issue of material fact with respect to a necessary element of his negligent misrepresentation claim and will grant Saxon's motion for summary judgment.

## V.      NEGLIGENCE (COUNT III)

To succeed on a negligence claim under Minnesota law, Nelson must prove (1) that Saxon had a legal duty of care; (2) that Saxon breached that duty; (3) that the breach of that duty was the proximate cause of Nelson's harm; and (4) damage.  *Brunsting v. Lutsen Mountains Corp.*, 601 F.3d 813, 820-21 (8th Cir. 2010); *Domagala v. Rolland*, 805 N.W.2d 14, 22 (Minn. 2011).  Nelson alleges that Saxon owed "a duty to clearly and competently communicate information related to Nelson's Mortgage Loan in a timely fashion" and breached that duty by failing "to timely provide Nelson with accurate information related to his loan despite the fact that this information should be readily available to Saxon."  (Compl. ¶¶ 45-46.)  Nelson also contends that his negligence claim is based upon "Saxon's continued demand for amounts not owed" and "Saxon

impeding Nelson's ability to perform under the agreement." (Pl.'s Mem. in Opp. to Mot. for Summ. J. at 22.) Saxon argues that Nelson's negligence claim is barred by the independent duty rule.

The independent duty rule provides limitations on when a party may assert tort claims against another with whom the party has a contractual relationship. *See Hanks v. Hubbard Broad., Inc.*, 493 N.W.2d 302, 308 (Minn. Ct. App. 1992). Minnesota does not recognize a cause of action for negligent breach of a contractual duty. *See Lesmeister v. Dilly*, 330 N.W.2d 95, 102 (Minn. 1983). Therefore, if a party's negligence claim is based on a breach of duty that "is indistinguishable from the breach of contract," the claim will fail, but if "a relationship would exist which would give rise to the legal duty without enforcement of the contract promise itself," the negligence claim may be viable. *Hanks*, 493 N.W.2d at 308 (internal quotation marks omitted); *see also Russo v. NCS Pearson, Inc.*, 462 F. Supp. 2d 981, 994 (D. Minn. 2006). In order to overcome application of the independent duty rule, Nelson must demonstrate that Saxon had a duty to provide him with information about his loan separate from any duties found in the Note, Mortgage, and/or Loan Modification. *See Jones v. W. Union Fin. Servs., Inc.*, 513 F. Supp. 2d 1098, 1100-01 (D. Minn. 2007); *see also Walker v. Bank of Am., N.A.*, Civ. No. 11-783, 2013 WL 5771154, at *7 (D. Minn. Oct. 24, 2013) (explaining that the independent duty rule can be overcome by showing a fiduciary or other independent duty).

Whether a legal duty exists is generally "an issue for the court to determine as a matter of law." *Louis v. Louis*, 636 N.W.2d 314, 318 (Minn. 2001); *see also Williams*,

820 N.W.2d at 815. "The general rule in Minnesota is that lenders bear no fiduciary duty to borrowers." *Roers v. Countrywide Home Loans, Inc.*, 728 F.3d 832, 838 (8th Cir. 2013) (internal quotation marks omitted) (affirming the district court's grant of summary judgment on plaintiffs' negligent misrepresentation and breach of fiduciary duty claims because the plaintiffs could not show that the lender owed a duty of care); *see also Walker*, 2013 WL 5771154 at *7-*8. Other jurisdictions have extended this general rule to loan servicers. *See Salehi v. Wells Fargo Bank, N.A.*, Civ. No. 11-1323, 2012 WL 2119333, at *5 (E.D. Va. June 11, 2012) (finding under Virginia law that there was no legally cognizable duty that a loan servicer owed to a borrower to "provide an accurate statement of the amount due under the note"); *Warden v. PHH Mortg. Corp.*, Civ. No. 10-75, 2010 WL 3720128, at *8-*9 (N.D. W. Va. Sept. 16, 2010) (finding that plaintiff could not maintain an action for negligence based upon the loan servicers alleged failure "to provide accurate information about the status of their loan account and to provide accurate notice of their payment due" because no special relationship creating the duties alleged to have been breached existed between the parties); *Marks v. Ocwen Loan Serv.*, Civ. No. 07-2133, 2009 WL 975792, at *7 (N.D. Cal. Apr. 10, 2009) ("[A] loan servicer does not owe a fiduciary duty to a borrower beyond the duties set forth in the loan contract."). Nelson has not identified any facts that take his relationship with Saxon outside the realm of a standard loan servicer-borrower relationship. *See Kichler v. Wells Fargo Bank, N.A.*, Civ. No. 12-1206, 2013 WL 4050204, at *4 (D. Minn. Aug. 9, 2013) (granting summary judgment on a negligent misrepresentation claim because plaintiffs failed to "allege any special relationship" with the lender and therefore failed to

establish the existence of a common law tort duty).   Consequently, the Court finds that Nelson has failed to demonstrate the existence of a duty that Saxon owed him independent of the contracts between the parties.

Additionally, the Court notes that Nelson's allegations in support of his negligence claim confirm that the breaches he complains of are based upon contractual obligations. Specifically, Nelson contends that it was negligent for Saxon to demand amounts not owed.  This allegation is based upon Nelson's argument that Saxon misapplied suspense account funds according to the priority system established **in the Mortgage**.  Nelson also contends in his negligence claim that Saxon impeded Nelson's ability to perform under loan documents by failing to provide him with accurate loan information.   These allegations go to Saxon's implied duty of good faith and fair dealing under the contract, and are insufficient to establish an independent tort duty.  *See Constr. Sys., Inc. v. General Cas. Co. of Wis.*, Civ. No. 09-3697, 2011 WL 3625066, at *10 (D. Minn. Aug. 17, 2011) (finding that breach of the covenant of good faith and fair dealing did not constitute an independent duty for purposes of bringing a tort claim separate from a breach of contract).  Because Saxon did not owe Nelson an independent duty separate from its contractual duties, the Court will grant Saxon's motion for summary judgment as to Nelson's negligence claim.

## VI.   EQUITABLE ESTOPPEL (COUNT V)

Minnesota courts recognize a doctrine of equitable estoppel that "is intended to prevent a party from taking unconscionable advantage of his own wrong by asserting his

strict legal rights." *N. Petrochemical Co. v. U.S. Fire Ins. Co.*, 277 N.W.2d 408, 410 (Minn. 1979). To establish a claim for equitable estoppel a plaintiff must show that the defendant "made representations or inducements, upon which plaintiff reasonably relied, and that plaintiff will be harmed if the claim of estoppel is not allowed." *Id.*; *see also Prod. Credit Assoc. of E. Cent. Wis. v. Farm Credit Bank*, 781 F. Supp. 595, 607 (D. Minn. 1991).

Nelson's claim for equitable estoppel is based on the same allegations that comprise his negligent misrepresentation claim. Specifically, Nelson alleges that Saxon failed to provide him with a reinstatement figure and he "relied to his detriment on Saxon failing to provide an accurate, timely, reinstatement figure." (Compl. ¶¶ 58, 62.) This allegation, like Nelson's claim for negligent misrepresentation, fails because, even if Saxon's "failure" to provide Nelson with information could somehow be construed as a representation, Nelson has not demonstrated that he actually relied on Saxon's failure to timely provide him with a reinstatement amount or on the reinstatement amount provided to him. Because the Court has already concluded that Nelson has failed to present any evidence of actual reliance upon any representations made by Saxon, the Court will also grant Saxon's motion for summary judgment with respect to the equitable estoppel claim.

## VII.   QUIET TITLE (COUNT VI)

Minnesota law permits persons in possession of real property to "bring an action against another who claims an estate or interest therein, or a lien thereon, adverse to the person bringing the action, for the purpose of determining such adverse claim and the

rights of the parties, respectively." Minn. Stat. § 559.01. Where a plaintiff prevails on claims that render a foreclosure void or invalid – such as a lender's failure to comply with the terms of Minnesota's foreclosure by advertisement statutes, he will also prevail on a quiet-title claim. *See Ruiz v. 1st Fidelity Loan Servicing, LLC*, No. A11-1081, 2012 WL 762313, at *5 (Minn. Ct. App. Mar. 12, 2012); *see also Gharwal v. Fed. Nat'l Mortg. Ass'n*, Civ. No. 13-0685, 2013 WL 4838904, at *3 (D. Minn. Sept. 11, 2013) (explaining that at the pleading stages "a quiet-title claim must be supported by an objectively reasonable basis for believing that the defendant's asserted interest in the property is invalid" (internal quotation marks omitted)).

Here, Nelson's potential success on his quiet-title claim hinges upon the success of his other claims, which the Court has determined must be submitted to a jury. Therefore, the Court will deny the motions for summary judgment with respect to this claim.[28]

---

[28] By denying summary judgment on this claim, the Court is merely ruling on the arguments in favor of summary judgment made by the parties. Saxon's motion for summary judgment relies solely upon its argument that summary judgment on Nelson's quiet-title claim is appropriate because all of his other claims fail as a matter of law. Saxon did not address whether, if Nelson ultimately succeeded on any of his other claims, the quiet-title claim would still fail. The Court therefore takes no position at this time as to whether success on either the claim for violation of Minn. Stat. § 580.30 or breach of the duty of good faith and fair dealing would necessarily alone be sufficient to show that the foreclosure was invalid and therefore support success on the quiet title claim. Nor does the Court take any position, in the absence of arguments from the parties, on whether, even in the event of success on Nelson's statutory or breach of contract claim, the quiet title claim would be barred for some other reason. *See e.g.*, *Novak v. JP Morgan Chase Bank, N.A.*, Civ. No. 12-589, 2012 WL 3638513, at *4 (D. Minn. Aug. 23, 2012) (finding that plaintiffs had unclean hands because they were in default on their mortgage and, therefore, could not state a quiet-title claim).

## VIII.  ACCOUNTING (COUNT VII)

Nelson seeks an "accurate or complete accounting of money claimed to be owed to Saxon under the Mortgage Loan." (Compl. ¶ 72.)  "[T]he right to an accounting is the right to have the defendant account for funds or other property." *Welk v. GMAC Mortg., LLC*, 850 F. Supp. 2d 976, 994 (D. Minn. 2012).  "An accounting is an extraordinary remedy usually available only when legal remedies are inadequate." *Border State Bank, N.A. v. AgCountry Farm Credit Servs.*, 535 F.3d 779, 784 (8th Cir. 2008).  The Eighth Circuit has consistently held that an accounting is inappropriate when normal discovery procedures are sufficient to obtain the necessary information. *See id.* at 785; *Lefkowitz v. Citi-Equity Grp., Inc.*, 146 F.3d 609, 611 (8th Cir. 1998) (affirming the denial of an account because plaintiff "had alternative discovery avenues available to procure the information he needed").

Here Nelson has not demonstrated that he was unable to obtain adequate information about his account and the amounts owed on his loan during the course of normal discovery procedures.  Although Nelson now highlights what he believes to be inconsistencies in the amounts recited in the various repayment plans and questions the manner in which suspense account funds were applied, he has not presented any evidence that he was unable to ask Saxon's representatives about these amounts in their depositions or submit document requests regarding the calculation of these amounts. *See Border State Bank, N.A.*, 535 F.3d at 785 ("Although the Bank now highlights discrepancies in the information produced by [defendants] and argues that the information produced is not sufficiently detailed, it does not explain why these

deficiencies could not have been adequately addressed through discovery."). Accordingly, the Court will grant Saxon's motion for summary judgment with respect to Nelson's claim for an accounting.

## ORDER

Based on the foregoing, and all the files, records, and proceedings herein, **IT IS HEREBY ORDERED** that:

1.    Defendants' Motion for Summary Judgment [Docket No. 15] is **GRANTED in part** and **DENIED in part** as follows:

    a.    Defendants' Motion is **GRANTED** with respect to Plaintiff's claims for negligent misrepresentation (Count II), negligence (Count III), equitable estoppel (Count V), and accounting (Count VII).  These claims are **DISMISSED with prejudice**.

    b.    Defendants' Motion is **DENIED** with respect to Plaintiff's claim for violation of Minn. Stat. § 580.30 (Count I), breach of contract (Count IV), and quiet title (Count VI).

2.    Nelson's Motion for Partial Summary Judgment [Docket No. 20] is **DENIED**.


DATED:  January 16, 2014          _____s/ John H. Tunheim_____
at Minneapolis, Minnesota.                    JOHN R. TUNHEIM
                                        United States District Judge